## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COLUMBIA

|  |  |
|---|---|
| **E.B., K.K., W.B., A.K.,**[1] and<br><br>**MEHATEMESELASSIE KETSELA DESTA,**<br>    Arada Kifle Ketema<br>    Woreda 5<br>    House No. 1352<br>    Addis Ababa<br>    Ethiopia,<br><br>                  Plaintiffs,<br><br>  v.<br><br><br>**UNITED STATES DEPARTMENT OF STATE,**<br>    2201 C Street NW<br>    Washington, D.C. 20520<br><br>**MICHAEL R. POMPEO,**<br>**in his official capacity as Secretary of the U.S. Department of State,**<br>    2201 C Street NW<br>    Washington, D.C. 20520<br><br>                  Defendants. | Civil Action No. 1:19-cv-2856<br><br><br><br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      The United States has the distinction of being one of the most diverse

nations in the world.  The Diversity Visa Program is intended to help the United States maintain

its unique mix of citizens with wide-ranging national and cultural backgrounds and to ensure the

---

[1] Plaintiffs E.B., K.K., W.B., and A.K. move to proceed under pseudonyms.  *See* LCvR 40.7(f).

country remains a place where people from every corner of the globe can make a home.  Enacted

by Congress in 1990, the program provides a chance to receive an immigrant visa to citizens of

countries with historically low levels of immigration to the United States.

        2.        Current U.S. immigration policy prioritizes family-based immigration.  Of

the approximately one million immigrants who become lawful permanent residents (or "green-

card holders") each year, more than half receive their status through family members.  In the

2017 fiscal year ("FY 2017"), 66% of new lawful permanent residents received their status either

through immediate U.S. citizen relatives or other family-based preferences.[2]  This has had the

effect of disproportionally benefitting immigrants with already large populations in the U.S.

Over the past several years, more than forty percent of the green cards issued each year have

gone to citizens of only six countries.[3] The Diversity Visa Program provides an important

opportunity for citizens of nations who might otherwise be locked out of the U.S. immigration

system—including many African nations—to obtain lawful permanent residency.  Of the nearly

117,000 green cards issued to Africans in FY 2017, over 20,000 were obtained through the

Diversity Visa Program.  That year, nearly one third of the green cards issued to citizens of Côte

D'Ivoire came through the Diversity Visa Program, and 2,424 out of the 15,678 green cards

issued to Ethiopians were issued through the Diversity Visa Program.[4]

---

[2] U.S. Department of Homeland Security, Table 11: Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Last Resident: Fiscal Year 2017, 2017 Yearbook of Immigration Statistics, https://www.dhs.gov/immigration-statistics/yearbook/2017/table11 [https://perma.cc/ERQ2-S2VA] (last visited Sept. 21, 2019).

[3] The six countries are Mexico, China, Cuba, the Dominican Republic, India, and the Philippines. *See, e.g.*, *id.*

[4] *Id.*

3.      President Donald Trump has been openly disdainful of the Diversity Visa Program and many of the immigrants who benefit from it.  During his first year in office, he declared "We are fighting hard for Merit Based immigration, no more Democrat Lottery Systems," and announced he was "starting the process of terminating the diversity lottery program," adding that "we have to get less politically correct."[5]  Since then, President Trump has made numerous false and misleading statements about the Diversity Visa Program and has openly disparaged individuals seeking to emigrate from African nations.

4.      Obtaining a diversity visa has few barriers.  Anyone from an eligible country (all but 18 countries worldwide) with either a high school education or equivalent or at least two years of work experience in the last five years (in a job that requires at least two years of training) may register.  Six months following the registration period, a drawing is held and about 100,000 applicants are randomly selected by computer to apply for a visa.  When a visa becomes available, those selected to apply for a visa must gather all required materials, including documents proving their eligibility, complete a medical exam, and secure the visa application fee.  Prior to this year, this was the stage at which applicants would also secure a passport if they did not have one.  Following intensive screening and a successful interview at the consular office, an applicant receives a visa.  Ultimately, the U.S. issues 50,000 visas per year. Unsuccessful participants in the lottery can, and often do, re-apply the following year with no prejudice to their application.

5.      On June 5, 2019, the State Department changed the requirements for registering for the Diversity Visa Program by issuing Interim Final Rule: Visas: Diversity

---

[5] Priscilla Alvarez, <u>The Diversity Visa Program Was Created to Help Irish Immigrants</u>, The Atlantic (Nov. 1, 2017), https://www.theatlantic.com/politics/archive/2017/11/diversity-visa-program/544646/ [https://perma.cc/5L8S-KW2D].

Requirements, 84 Fed. Reg. 25,989 (June 5, 2019) (codified at 22 C.F.R. § 42.33 (2019))

("Passport Rule").  As a result of this rule, for the first time in the program's nearly three-decade

existence, applicants must possess a valid passport just to enter the lottery.  Previously, a

passport was not necessary until an applicant had been selected to apply for a visa.  In many

countries obtaining a passport is a daunting prospect.  In countries like Côte d'Ivoire or Ethiopia,

where Plaintiffs are from, applying for and obtaining a passport can take months, often costs a

sizable portion of a person's income, and necessitates lengthy travel and time off work.  The

State Department's new rule no longer permits applicants to wait and see if they are chosen to

apply for a visa before embarking on the arduous and costly task of obtaining a passport.

6.     The State Department promulgated this rule without fulfilling notice-and-

comment requirements, instead invoking the foreign affairs exception of the Administrative

Procedures Act ("APA"), 5 U.S.C. § 553.

7.     The new rule was effective immediately upon publication on June 5, 2019.

For the past several years, the Diversity Visa Program online entry form typically opens to

applicants in early October.  The rule erects a barrier that effectively disqualifies significant

numbers of would-be applicants from countries where it is costly, time-consuming, or otherwise

impractical to obtain a new passport just to enter a lottery that provides them a chance of being

chosen to apply for a visa.  Thus, arguably intentionally, the new rule would have the effect of

discouraging citizens of African countries from even applying for diversity visas.

8.     Despite its immense impact, the new rule is not advertised or explained on

the State Department's Diversity Visa Program website, nor is it included in its written

application guide or instructional video.  By dispensing with the notice-and-comment

requirement and failing to publicize this "pertinent information" and "ensure the widest possible

dissemination of the information, both abroad and within the United States," as required by law, 22 C.F.R. § 42.33(b)(3), the State Department has condemned the applications of numerous lottery participants who have not been made aware of the Passport Rule, and will not have sufficient time to obtain a passport in order to register.

9.     The State Department's new rule violates the APA because it was adopted without notice and an opportunity for public comment, as required by the APA.

## JURISDICTION AND VENUE

10.     This case arises under the APA, 5 U.S.C. § 701, et seq.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

11.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are an officer of the United States acting in his official capacity and an agency of the United States, Defendants reside in this judicial district, and a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## PARTIES

12.     Plaintiff E.B. is an Ethiopian citizen and resident of Arba Minch, Ethiopia. E.B. intends to apply for the 2019 Diversity Visa Program when the application period opens in October 2019.  But for the Passport Rule, E.B. would be able to submit an application for the Diversity Visa Program.

13.     Plaintiff K.K. is an Ivorian citizen and resident of Abidjan, Côte d'Ivoire. K.K. intends to apply for the 2019 Diversity Visa Program when the application period opens in October 2019.  But for the Passport Rule, K.K. would be able to submit an application for the Diversity Visa Program.

14.     Plaintiff Mehatemeselassie Ketsela Desta is an Ethiopian citizen and a resident of Addis Ababa, Ethiopia.  Mr. Desta intends to apply for the 2019 Diversity Visa

Program when the application period opens in October 2019.  But for the Passport Rule, Mr. Desta would be able to submit an application for the Diversity Visa Program.

15.     Plaintiff W.B. is a native of Ethiopia and a resident of Rockville, Maryland.  Plaintiff E.B. is her brother.  She hopes that her brother will one day reunify with her by immigrating to the United States.

16.     Plaintiff A.K. is a native of Côte d'Ivoire and a resident of New York, NY. Plaintiff K.K. is her brother.  She hopes that her brother will one day reunify with her by immigrating to the United States.

17.     Defendant Michael Pompeo is Secretary of State of the United States.  He is sued in his official capacity.  Under the Immigration and Nationality Act, he has the authority to issue regulations to implement the Diversity Visa Program, and in his official capacity, he issued the Passport Rule challenged in this action.  8 U.S.C. §§ 1153, 1154; *see also* 22 C.F.R. § 42.33(b)(1)(viii), (ix).

18.     Defendant U.S. Department of State is an agency of the United States within the meaning of the APA.  It is responsible for overseeing the United States visa and immigration program and adopting implementing regulations under the Immigration and Nationality Act.  8 U.S.C. §§ 1153, 1154; *see also* 22 C.F.R. § 42.33(b)(1)(viii), (ix).

## BACKGROUND

### The Diversity Visa Application Process

19.     The Diversity Visa Program was established in 1990 by the Immigration and Nationality Act of 1990, Pub. L. No. 101-649, § 131, 104 Stat. 4978, 4997 et seq. (codified at 8 U.S.C. § 1153(c)).  The new law created a mechanism by which potential immigrants from "low-admission states" of the world, or places that historically had been "adversely affected" by U.S. immigration laws, could immigrate to the United States.  *Id.*

6

20.     A "low-admission state" is one with "historically low rates of immigration

to the United States," defined as less than 50,000 citizens admitted to the United States over the

past five years.  8 U.S.C. § 1153(c)(1)(B).  For the most recent registration period, DV-2020, this

included every country in the world except 18: Bangladesh, Brazil, Canada, mainland China,

Colombia, the Dominican Republic, El Salvador, Haiti, India, Jamaica, Mexico, Nigeria,

Pakistan, Peru, the Philippines, South Korea, the United Kingdom (except Northern Ireland) and

its dependent territories, and Vietnam.[6]

21.     The State Department issues diversity visas through a lottery.  The

eligibility requirements for entering the lottery historically have been limited, enabling a wide

and diverse pool of applicants to participate.  Aside from being born in a low-admission state, or

having a spouse or parents born in a low-admission state, eligible applicants must have either a

high school education or its equivalent, or "two years of work experience within the past five

years that requires at least two years of training or experience to perform." 8 U.S.C.

§ 1153(c)(2).

22.     The first step to participating in the lottery involves registering for the

Diversity Visa Program.  Applicants must register by completing an electronic entry form, which

typically opens in October and closes in November.  Applicants must provide their name,

gender, birth date, city and country of birth, country of eligibility, country of residence, recent

photograph, email address, highest level of education, current marital status, and number of

---

[6] U.S. Department of State, <u>Instructions for the 2020 Diversity Immigrant Visa Program (DV-2020)</u>, https://travel.state.gov/content/dam/visas/Diversity-Visa/DV-Instructions-Translations/DV-2020-Instructions-Translations/DV-2020-Instructions-English.pdf [https://perma.cc/XLH2-SMFE] (last visited Sept. 21, 2019).

children.[7]  The application permits applicants to indicate if they do not have or know certain

information.  *Id.*  There is no fee to register for the Diversity Visa Program.  *Id.*  Prior to the rule

change, a valid passport was not required to register for the program.  During the registration

period for DV-2018, the most recent period for which data is publicly available, over 14 million

people registered.[8]

23.    Approximately six months after the registration period, typically in May,

lottery "winners" can check to see if they have been selected.[9]  Winning the lottery does not

automatically provide a person with a visa to immigrate to the U.S.  It merely allows a winner to

apply for a visa.  *See id.*  About twice the number of allotted diversity visas are selected during

the drawing in order to ensure that by the end of the process 50,000 can be issued.[10]

24.    For those selected to apply for a visa, the next step in the diversity visa

process is the gathering of supporting materials followed by an intensive screening.  This

---

[7] U.S. Department of State, Instructions for the 2020 Diversity Immigrant Visa Program (DV-2020), https://travel.state.gov/content/dam/visas/Diversity-Visa/DV-Instructions-Translations/DV-2020-Instructions-Translations/DV-2020-Instructions-English.pdf [https://perma.cc/XLH2-SMFE] (last visited Sept. 21, 2019).

[8] U.S. Department of State, Diversity Visa Program, DV 2016-2018: Number of Entries Received During Each Online Registration Period by Country of Chargeability, Diversity Visa Program Statistics, https://travel.state.gov/content/dam/visas/Diversity-Visa/DVStatistics/DV%20AES%20statistics%20by%20FSC%202016-2018.pdf [https://perma.cc/MQC4-DSRW] (last visited Sept. 21, 2019).

[9] *See* U.S. Department of State, Diversity Visa Program, If You Are Selected, https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry/diversity-visa-if-you-are-selected.html [https://perma.cc/39SG-JYQ4] (last visited Sept. 21, 2019) (entrants in two previous lotteries could check to see if they were selected as of May 1, 2018 and May 7, 2019 respectively).

[10] *See, e.g.*, U.S. Department of State, DV 2015 – Selected Entrants, https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry/dv-2015-selected-entrants.html [https://perma.cc/66QL-W2P4] (last visited Sept. 21, 2019) (125,514 applicants selected in 2014 for 50,000 visas).

screening includes a background check, criminal history check, review of biometric data and supporting documentation, cross-checks with various watch-lists, and an in-person interview.[11] Before the rule change, applicants needed a valid passport only at this stage, once they had been selected to apply for a visa.  Applying for a passport at this stage is often much easier than at the entry stage; if applicants know they have been selected, they can solicit financial or logistical assistance from family or their community, help that is often unavailable at the initial stage when an immigration visa to the United States remains unlikely.

25.     Applicants who are not chosen in the lottery are free to register again the following year, with no prejudice to their application.

26.     In FY 2018, 20,532 of the 49,713 total diversity visas issued, or over 41 percent, went to citizens of African countries.[12]

**The Proposed Rule Change**

27.     On June 5, 2019, the State Department published the Interim Final Rule, 84 Fed. Reg. 25,989 (June 5, 2019) (codified at 22 C.F.R. § 42.33), effective immediately.

28.     The new rule requires all applicants to provide a valid passport number, country or authority of passport issuance, and expiration date on the electronic entry form.  84 Fed. Reg. at 25,989.  Whereas in prior years only the roughly 100,000 individuals selected to apply for a visa would have to possess or obtain valid passports before their visas would be

---

[11] Bipartisan Policy Center, Fact Sheet: Diversity Visa Lottery, https://bipartisanpolicy.org/blog/fact-sheet-diversity-visa-lottery/ [https://perma.cc/DVC4-BDJJ] (last visited Sept. 21, 2019).

[12] U.S. Department of State, Immigrant Number Use for Visa Issuances and Adjustments of Status in the Diversity Immigrant Category, Report of the Visa Office 2018, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2018AnnualReport/FY18 AnnualReport%20-%20TableVII.pdf [https://perma.cc/KCQ3-MNUX] (last visited Sept. 21, 2019).

issued, the new rule would require all applicants (a pool of 14 million people in the most recent lottery) to already possess a valid passport.

29.      The State Department claims it is promulgating this new rule because it "has historically encountered significant numbers of fraudulent entries for the [diversity visa] program each year. . . . Requiring that each entry form include a valid passport number at the time of the [Diversity Visa] Program entry will make it more difficult for third parties to submit unauthorized entries, because third parties are less likely to have individuals' passport numbers." 84 Fed. Reg. at 25,990.

30.      The rule introduces a new formal requirement for application, which will have the immense practical effect of barring many – possibly millions – of applicants from entering the lottery.  It also likely will alter substantially the profile of the applicant class, decreasing its diversity by creating a preference for applicants from wealthier nations where passports are more easily obtained.

31.      The APA requires that for every rule, with limited exceptions, there must be an opportunity for public participation in the rulemaking, through notice of the proposed rule and an opportunity to comment prior to its issuance.  5 U.S.C. § 553.

32.      The State Department published the Passport Rule as an interim final rule, without notice and comment.  It claims it is "exempt from notice and comment under the foreign affairs exception of the" APA.  84 Fed. Reg. at 15,990 (citing 5 U.S.C.§ 553(a)(1)).

33.      The foreign affairs exception "is not to be loosely interpreted to mean any function extending beyond the borders of the United States, but only those 'affairs' which so affect relations with other Governments, that, for example, public rule-making provisions would

clearly provoke definitely undesirable international consequences." *Hou Ching Chow v. Attorney Gen.*, 362 F. Supp. 1288, 1290 (D.D.C. 1973) (quoting S. Rep. No. 79-752 (1946)).

34.     In support of this exemption, the State Department claimed that the "rule clearly and directly impacts a foreign affairs function of the United States" because it "pertains to a visa program which serves as a clear tool of diplomacy and outreach to countries around the world." 84 Fed. Reg. at 15,990.  The State Department further claimed that "this rule addresses a vulnerability in the current application process by making it more difficult for third parties to submit fraudulent or unauthorized entries, a practice that has significant consequences." *Id.*

35.     The State Department further asserted that the Diversity Visa Program "serves as an outreach tool" to "foreign populations" and is an "important public diplomacy tool." *Id*.

36.     The State Department provided no evidence or support for the principle that 50,000 visas issued at random across the world serve as an "important public diplomacy tool," much less that introducing a substantial barrier to applicants averts "definitely undesirable international consequences." *Id.*  The availability of the diversity visa to foreign citizens has, at most, a miniscule effect on "foreign populations."[13]

37.     Even accepting the State Department's contention that the Diversity Visa Program is an "important public diplomacy tool," the State Department did not provide any explanation of how *abandoning the notice-and-comment period* for the Passport Rule would

---

[13] Citizens of Ethiopia, a country of over 100 million, received 2,424 diversity visas last year, among the largest number of diversity visas for any one country.  U.S. Department of Homeland Security, Table 11: Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Last Resident: Fiscal Year 2017, 2017 Yearbook of Immigration Statistics, https://www.dhs.gov/immigration-statistics/yearbook/2017/table11 [https://perma.cc/ERQ2-S2VA] (last visited Sept. 21, 2019).

negatively affect diplomacy with foreign nations or populations, or provoke undesirable consequences to foreign affairs.  If anything, it is the adoption of the Passport Rule with no notice or opportunity for comment that could harm diplomatic efforts and outreach to "foreign populations" that would see many applications effectively invalidated by the passport requirement.

38.     The State Department also claims that the Passport Rule is needed to protect against "fraudulent entries . . . including entries submitted by criminal enterprises on behalf of individuals without their knowledge." 84 Fed. Reg. at 25990.  The State Department asserts that "requiring that each entry form include a valid passport number at the time of the DV Program entry will make it more difficult for third parties to submit unauthorized entries, because third parties are less likely to have individuals' passport numbers." *Id*.  But the Passport Rule does nothing to prevent bad actors from using information from fake or stolen passports to enter the Diversity Visa Program.  Indeed, in many of the countries most affected by the Passport Rule, it is easier for "criminal enterprises" to obtain passports than individuals, and passport data theft is a significant worldwide problem.[14]  Moreover, criminal enterprises are less likely to change their behavior as a result of this rule than individuals, meaning that the Passport Rule will exclude genuine applicants with little effect on fraudulent applications.

---

[14] *See, e.g.*, David E. Sanger, Marriott Concedes 5 Million Passport Numbers Lost to Hackers Were Not Encrypted, N.Y. Times, (Jan. 4, 2019), https://www.nytimes.com/2019/01/04/us/politics/marriott-hack-passports.html [https://perma.cc/B8HR-VM2T]; Kate Fazzini, Here's How Criminals Use Stolen Passport Information, CNBC, (July 5, 2019), https://www.cnbc.com/2019/07/05/how-criminals-use-stolen-passport-information.html [https://perma.cc/9E6F-HHL4].

**The Effect of the New Rule**

39.     The new rule requiring passports at the initial application stage is a prohibitive and onerous requirement for many applicants, especially those from African countries.

40.     The majority of people around the world do not possess a valid passport. Even in the United States, a wealthy and developed nation, only approximately 40 percent of Americans have valid U.S. passports.[15]

41.     In many African countries, including Ethiopia and Côte D'Ivoire, obtaining a passport—particularly on short notice—is often an arduous if not impossible undertaking.  One reason is that the cost of acquiring a new passport can be high relative to average income.  For example, in the Democratic Republic of Congo, a passport costs $185, a significant portion of the average per capita income of $456 per year.[16]  In Ethiopia, the fee for a passport is approximately $20, which is the average monthly income for over 80 percent of the population.  (Ex. A, Declaration of Solomon Teshome Retta ("Solomon Decl."), at ¶ 9.)  People who need passports often must take time off from work and travel long distances, particularly those who do not live in or near large cities with passport offices.  (Solomon Decl. ¶¶ 6-8.)  This adds further cost and burden that, in parts of the world where average income and employment is low, can be prohibitive.

---

[15] U.S. Department of State, Passport Statistics, https://travel.state.gov/content/travel/en/passports/after/passport-statistics.html [https://perma.cc/H3G3-PKMU] (last visited Sept. 21, 2019).

[16] Conor Gaffey, Why Is A Congolese Passport More Expensive Than A U.S. One?, Newsweek (April 18, 2017), https://www.newsweek.com/congo-passport-joseph-kabila-585530 [https://perma.cc/9MF6-GYKA].

42.     In addition to financial hardship, administrative hurdles make acquiring a new passport time-consuming and impractical in many African countries.  Just months ago, Zimbabwe did not have enough foreign currency to purchase the ink and paper required to print new passports, and Zimbabweans had to sleep outside of the passport office to fill out passport applications.[17]  Uganda also has suffered shortages of materials required to print new passports, resulting in lengthy delays.[18]  In Ethiopia, in order to obtain a passport one must first possess a resident ID card and a birth certificate, and in order to obtain either of these documents Ethiopians must satisfy a thicket of rules and requirements.  (Solomon Decl. ¶¶10-12.) Moreover, according to recent news reports, Ethiopia is experiencing a shortage of passport books because of a lack of hard currency, leading to 45-day delays between application for and issuance of passports.[19]  As would-be diversity-visa applicants in Ethiopia learn of the Passport Rule, these delays are likely to increase.  In these and many other African countries, obtaining a new passport is a significant investment of time and money, and imposes a prohibitively steep cost for the small chance of being chosen through the visa lottery.

43.     As a result of the State Department's promulgation of the rule without notice and comment, the public has little information about the new requirement.  To date, the

---

[17] Farai Mutsaka, "We are trapped": Zimbabwe's Economic Crunch Hits Passports, Associated Press News (June 15, 2019), https://www.apnews.com/217ddb22679a4c2f881f0d1e2391239c [https://perma.cc/QDQ5-FXFF].

[18] Misari Thembo Kahungu, Passport Shortage Hits Labour Export Agencies, Daily Monitor (April 5, 2019), https://www.monitor.co.ug/News/National/Passport-shortage-Siminyu-labour-export-agencies-Kania/688334-5059004-15pvihez/index.html [https://perma.cc/A8NU-ZN2P].

[19] Dawit Astatike, Obtaining Passport Still Delayed, Capital (Sept. 16, 2019), https://www.capitalethiopia.com/capital/obtaining-passport-still-delayed/ [https://perma.cc/X33Y-YASA]; Kalaeb Girma, Ethiopia: New Directive Eases Passport Application Process, allAfrica (Aug. 17, 2019), https://allafrica.com/stories/201908220319.html [https://perma.cc/D5J3-S95N].

Diversity Visa Program website does not contain information about the change for the next lottery, which typically runs from early October to early November.[20]  The written instructions available on the State Department's website also have not been updated.[21]  Neither have the video instructions.[22]  Because the Department has failed to provide any notice, or opportunity for public comment, many potential applicants will not be aware of the new requirements and, if and when they become aware, may not have sufficient time to procure a new passport during the short month-long period during with program applications are accepted.

44.     The effect of this rule will be to exclude significant numbers of diversity visa applicants from African countries, who currently make up a large proportion of diversity visa recipients.

45.     The Trump Administration has made its hostility towards the diversity lottery clear.  In November 2017, President Trump expressed his intent to eradicate the Diversity Visa Program, declaring: "We are fighting hard for Merit Based immigration, no more Democrat Lottery Systems," and that he would be "starting the process of terminating the diversity lottery

---

[20] *See* U.S. Department of State, Diversity Visa Program – Entry, https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry.html [https://perma.cc/XBJ4-XFHQ] (last visited Sept. 21, 2019).

[21] *See* U.S. Department of State, Instructions for the 2020 Diversity Immigrant Visa Program (DV-2020), https://travel.state.gov/content/dam/visas/Diversity-Visa/DV-Instructions-Translations/DV-2020-Instructions-Translations/DV-2020-Instructions-English.pdf [https://perma.cc/7QBF-CZLF] (last visited Sept. 21, 2019).

[22] *See* U.S. Department of State, U.S. Diversity Visa Program Tutorial: Submitting an Entry, https://www.youtube.com/watch?v=tOQlh2d2EbQ&feature=youtu.be (last visited Sept. 21, 2019).

program," because "we have to get less politically correct."[23]  In February 2019 he described the

Diversity Visa Program as "a horror show, because when countries put people into the lottery,

they're not putting you in; they're putting some very bad people in the lottery."[24]  In August,

2019, he inaccurately and disparagingly described the lottery process: "you pick people out of

the lottery.  Well let's see, this one is a murderer, this one robbed four banks, this one I better not

say, this one another murderer, ladies and gentlemen, another murderer. . . . Do you think

[countries] are going to put their great citizens . . . into the lottery? Look at the people they put

into these lotteries."[25]

> 46.    The President also has complained about immigrants coming from African

nations, asking "why do we want all these people from shithole countries coming here?" and

"[w]e should have more people from places like Norway."[26]

> 47.    The Passport Rule, which would have the effect of excluding significant

numbers of citizens of African countries from registering for the Diversity Visa Program,

represents an attempt by this Administration to curb applications from poorer countries, reducing

---

[23] Priscilla Alvarez, The Diversity Visa Program Was Created to Help Irish Immigrants, The Atlantic, (Nov. 1, 2017), https://www.theatlantic.com/politics/archive/2017/11/diversity-visa-program/544646/ [https://perma.cc/WG6M-WKTS].

[24] Calvin Woodward and Hope Yen, AP Fact Check: Trump Spins Fiction About Diversity Visas, Associated Press, (Feb. 18, 2019),
https://www.apnews.com/56e8c95dab1345bbac9d065eaa1b8152 [https://perma.cc/63NW-VML2].

[25] President Trump in Cincinnati, Ohio, CNN, (Aug. 1, 2019), https://www.c-span.org/video/?463078-1/president-trump-holds-campaign-rally-cincinnati-ohio.

[26] Eli Watkins and Abby Philip, Trump Decries Immigrants from "Shithole Countries" Coming to US, CNN, (Jan. 12, 2018), https://www.cnn.com/2018/01/11/politics/immigrants-shithole-countries-trump/index.html [https://perma.cc/MB3F-64E7].

the diversity of applicants and frustrating Congress's intent in enacting the Diversity Visa Program.

**Harms to Plaintiffs**

48.     Plaintiffs are individual citizens of countries affected by the Passport Rule, who intend to apply for the Diversity Visa Program in the upcoming October window.  The Passport Rule causes each Plaintiff significant harm.

49.     Plaintiff E.B. is a resident of Arba Minch, Ethiopia.  He has lived in Ethiopia his entire life, and has never left the country.  He has operated a mechanic's shop for the last three years.  He earns approximately $68.50 per month.  He has applied for the Diversity Visa Program three times in the past, most recently in 2016.  He intends to apply again this October.  Until the promulgation of the Passport Rule, he satisfied the requirements of the Diversity Visa Program.

50.     E.B. has never owned an Ethiopian passport, and has never attempted to apply for one.  Because of Defendants' failure to provide a notice-and-comment period for the Passport Rule, E.B. found out only in September 2019 that he was now required to possess a passport in order to apply.  The $20 cost of an Ethiopian passport is a substantial portion of E.B.'s monthly income.  Applying for a passport in Ethiopia will require him to incur additional costs.  Arba Minch is hours by car from Awassa, the closest city in which he can apply for a passport.  E.B. does not own a car, and if he travels to Awassa by bus it will cost him over $11 one way.  He will have to make this trip twice: once to apply for, and once again to retrieve, his passport.  Furthermore, he will have to close his mechanic's shop for at least two days, incurring a lost income of approximately $7 to $14.  Thus, just applying for a passport will cost E.B. nearly a month's income.

51.     This cost does not include the indirect costs associated with acquiring the necessary supporting documents for his passport application.  Before E.B. can even apply for a passport, he will have to apply for and obtain documentation of his birth, parentage, residence, and education.  This would require additional travel, cost, and lost income.  The financial burden of applying for and acquiring a passport just to enter the Diversity Visa Program is prohibitively high for E.B.  If he were selected in the Diversity Visa Program, he could manage to incur the substantial costs involved to obtain a passport with the assistance of family and friends.  This help is not available merely for his application for the Diversity Visa Program.

52.     Even if E.B. could manage to incur the financial cost to apply for a passport, the process for applying and obtaining a passport is so time-consuming that he will not receive his passport before the Diversity Visa Program application window closes in November.

53.     As a result of the Passport Rule, E.B. will lose his opportunity to apply for the Diversity Visa Program and will be forced to wait an entire year to apply again.  As a further result, Plaintiff W.B., E.B.'s sister who resides in Rockville, Maryland, will lose the opportunity to reunite with her brother, and will have to wait at least another year for E.B. to apply again.

54.     Plaintiff K.K. is a resident of Abidjan, Côte d'Ivoire, where he has lived his entire life.  He has worked for the past three years for a company that manufactures plastics for tires, working six days a week.  He earns approximately $58 per month in base salary.  Since 2013, he has applied for the Diversity Visa Program every year except 2018.  He intends to apply again this October.  Until the promulgation of the Passport Rule, he satisfied the requirements of the Diversity Visa Program.

55.     K.K. has never owned an Ivorian passport.  To acquire an Ivorian passport, K.K. would have to pay $80, more than his average monthly base salary, and half of

what he earns in an exceptionally lucrative month.  In addition to the enormous cost, K.K. faces significant administrative burdens in applying for a new passport.  He first will require a national identification card, which is itself difficult, costly, and time-consuming to obtain.  To acquire a national identification card, he will first need to procure two original birth certificates, a citizenship certificate, and a temporary identification card.  Obtaining each of these is itself time-consuming and expensive.  The cost of obtaining these documents is $40.  Moreover, he would be required to take time off from work, which is logistically difficult and would cost him income.

56.     K.K. thus would have to pay at least $120 just to acquire a passport, an amount more than double his monthly base salary.  This does not include the costs associated with traveling to and from the various administrative offices in order to obtain the passport and supporting documents, and the lost income from time spent not working.  The financial burden of applying for and acquiring a passport just to enter the Diversity Visa Program is therefore prohibitively high for K.K.  If he were selected in the Diversity Visa Program, he could manage to incur the substantial costs involved to obtain a passport with the assistance of family and friends.  This help is not available merely for his application for the Diversity Visa Program.

57.     Even if K.K. were able to muster the financial resources to apply for a passport, he would not receive his passport before the Diversity Visa Program application window closes in November.  In Côte d'Ivoire, obtaining a national identification card, a prerequisite to applying for an Ivorian passport, takes approximately three months.  Even if he applies immediately, he will miss this year's application window.

58.     As a result of the Passport Rule, K.K. will lose his opportunity to apply for the Diversity Visa Program, and will be forced to wait at least an entire year to apply again.  As a further result, Plaintiff A.K., K.K.'s sister who resides in New York, New York, will lose the

opportunity to reunite with her brother, and will have to wait another year for K.K. to apply again.

59.     Plaintiff Mehatemeselassie Ketsela Desta is a resident of Addis Ababa, Ethiopia.  He has lived in Ethiopia his entire life, and has never left the country.  Plaintiff Desta is a priest in the Ethiopian Orthodox Church.  He has applied for the Diversity Visa Program numerous times, most recently in 2018.  He intends to apply again this October.  Until the promulgation of the Passport Rule, he satisfied the requirements of the Diversity Visa Program.

60.     Mr. Desta does not currently possess an Ethiopian passport.  Because of Defendant's failure to provide a notice and comment period for the Passport Rule, Mr. Desta found out only in September 2019 that he was now required to possess a passport in order to apply.

61.     The process of applying and obtaining a passport in Ethiopia is so time-consuming that, even if Mr. Desta were to apply for a passport today, he would not receive one before the Diversity Visa Program application window closes in November.

62.     As a result of the Passport Rule, Mr. Desta will lose his opportunity to apply for the Diversity Visa Program, and will be forced to wait an entire year to apply again.

## CLAIM FOR RELIEF
## (ADMINISTRATIVE PROCEDURE ACT)

63.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

64.     The Rule is subject to the APA's requirement for notice and opportunity for comment prior to the promulgation of regulations.  5 U.S.C. § 553(b), (c).

65.     The Secretary of State failed to provide notice and an opportunity to comment on the Rule in a timely manner, violating the APA.

66.     The Rule does not fall within the APA's foreign affairs exception, 5 U.S.C. § 553(a)(1), and the Secretary of State has not asserted any other APA exception, nor is any other applicable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

(a)     A declaration pursuant to 28 U.S.C. § 2201 that the Passport Rule is unlawful and invalid;

(b)     A preliminary and permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Passport Rule;

(c)     An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

(d)     Such other and further relief as the Court deems equitable, just, and proper.

Dated:   September 24, 2019

FRIEDMAN KAPLAN SEILER &
   ADELMAN LLP

Philippe Adler*
Anil K. Vassanji*
7 Times Square
New York, NY 10036-6516
(212) 833-1100
avassanji@fklaw.com


  *Application for admission pro hac vice
*forthcoming*

THE INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION

/s/ Seth Wayne
Seth Wayne (D.C. Bar No. 888273445)
Jonathan L. Backer (D.C. Bar No. 1613073)*
Robert D. Friedman (D.C. Bar No. 1046738)
Mary B. McCord (D.C. Bar No. 427563)
600 New Jersey Ave NW
Washington, DC 20001
(202) 662-4192
sw1098@georgetown.edu


*Attorneys for Plaintiffs.*