## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COLUMBIA

|  |  |
|---|---|
| **E.B., K.K., W.B., A.K.**,[1] <br><br>                  Plaintiffs, <br><br>    v. <br><br><br> **UNITED STATES DEPARTMENT OF STATE,** <br>    2201 C Street NW <br>    Washington, D.C. 20520 <br><br> **MICHAEL R. POMPEO,** <br>**in his official capacity as Secretary of the U.S. Department of State,** <br>    2201 C Street NW <br>    Washington, D.C. 20520 <br><br>              Defendants. | Civil Action No. 19-cv-2856 (TJK) <br><br><br><br><br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     The United States has the distinction of being one of the most diverse nations in the world.  The Diversity Visa Program is intended to help the United States maintain its unique mix of citizens with wide-ranging national and cultural backgrounds and to ensure that the country remains a place where people from every corner of the globe can make a home.

---

[1] Contemporaneously with the filing of the original Complaint, ECF No. 1, Plaintiffs E.B., K.K., W.B., and A.K. moved to proceed under pseudonyms, *see* ECF No. 2.  On September 26, 2019, this Court granted that motion.  ECF No. 8.

Enacted by Congress in 1990, the program provides a chance to receive an immigrant visa to citizens of countries with historically low levels of immigration to the United States.

2.      Current U.S. immigration policy prioritizes family-based immigration.  Of the approximately one million immigrants who become lawful permanent residents (or "green-card holders") each year, more than half receive their status through family members.  In the 2017 fiscal year ("FY 2017"), 66 percent of new lawful permanent residents received their status either through immediate U.S. citizen relatives or other family-based preferences.[2]  This has had the effect of disproportionally benefitting immigrants with already large populations in the U.S.  Over the past several years, more than 40 percent of the green cards issued each year have gone to citizens of only six countries.[3]  The Diversity Visa Program provides an important opportunity for citizens of nations who might otherwise be locked out of the U.S. immigration system – including many African nations – to obtain lawful permanent residency.  Of the nearly 117,000 green cards issued to Africans in FY 2017, over 20,000 were obtained through the Diversity Visa Program.  That year, nearly one third of the green cards issued to Ivorians came through the Diversity Visa Program, and 2,424 out of the 15,678 green cards issued to Ethiopians were issued through the Diversity Visa Program.[4]

3.      President Donald Trump has expressed open disdain for the Diversity Visa Program and many of the immigrants who benefit from it.  During his first year in office, he

---

[2] U.S. Department of Homeland Security, Table 11: Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Last Residence: Fiscal Year 2017, 2017 Yearbook of Immigration Statistics, https://www.dhs.gov/immigration-statistics/yearbook/2017/table11 [https://perma.cc/ERQ2-S2VA] (last visited Sept. 21, 2019).

[3] The six countries are Mexico, China, Cuba, the Dominican Republic, India, and the Philippines. *See, e.g.*, *id.*

[4] *Id.*

declared, "We are fighting hard for Merit Based immigration, no more Democrat Lottery

Systems," and announced he was "starting the process of terminating the diversity lottery

program," adding that "we have to get less politically correct."[5]  Since then, President Trump has

made numerous false and misleading statements about the Diversity Visa Program and has

openly disparaged individuals seeking to immigrate from African nations.

        4.      Obtaining a diversity visa has few formal requirements.  Anyone from an

eligible country (all but 18 countries worldwide) with either a high school education or

equivalent or at least two years of work experience in the last five years (in a job that requires at

least two years of training) may register.  Six months following the registration period, a drawing

is held and about 100,000 applicants are randomly selected by computer to apply for a visa.

When a visa becomes available, those selected to apply for a visa must gather all required

materials (including documents proving their eligibility), complete a medical exam, and secure

the visa application fee.  Prior to this year, this was the stage at which applicants would also

secure a passport if they did not have one.  Following intensive screening and a successful

interview at the consular office, an applicant receives a visa.  Ultimately, the U.S. issues 50,000

visas per year.  Unsuccessful participants in the lottery can, and often do, re-apply the following

year with no prejudice to their applications.

        5.      On June 5, 2019, the State Department changed the requirements for

registering for the Diversity Visa Program by issuing Interim Final Rule: Visas: Diversity

Requirements, 84 Fed. Reg. 25,989 (June 5, 2019) (codified at 22 C.F.R. § 42.33 (2019))

("Passport Rule").  As a result of this rule, for the first time in the program's nearly three-decade

---

[5] Priscilla Alvarez, The Diversity Visa Program Was Created to Help Irish Immigrants, The
Atlantic (Nov. 1, 2017), https://www.theatlantic.com/politics/archive/2017/11/diversity-visa-
program/544646/ [https://perma.cc/5L8S-KW2D].

existence, applicants must possess a valid passport just to enter the lottery.  Previously, a

passport was not necessary until an applicant had been selected to apply for a visa.  In many

countries obtaining a passport is a daunting prospect.  In countries like Côte d'Ivoire or Ethiopia,

where Plaintiffs are from, applying for and obtaining a passport can take months, often costs a

sizable portion of a person's income, and necessitates lengthy travel and time off work.  The

State Department's new rule no longer permits applicants to wait and see if they are chosen to

apply for a visa before embarking on the arduous and costly task of obtaining a passport.

6.      The State Department promulgated this rule without fulfilling notice-and-

comment requirements, instead invoking the foreign affairs exception of the Administrative

Procedure Act ("APA"), 5 U.S.C. § 553.

7.      The new rule was effective immediately upon publication on June 5, 2019.

For the past several years, the Diversity Visa Program online entry form typically has opened to

applicants in early October.  The rule erects a substantive barrier that effectively disqualifies

significant numbers of would-be applicants from even entering the lottery, thereby depriving

them of any chance of being chosen to apply for a visa.  This is especially true of applicants from

countries where it is costly, time-consuming, or otherwise impractical to obtain a new passport.

Thus, the direct and foreseeable effect of the new rule is to discourage citizens of African

countries from even applying for diversity visas.

8.      The State Department's new rule violates the APA because it was adopted

without notice and an opportunity for public comment, as the statute requires.

## JURISDICTION AND VENUE

9.      This case arises under the APA, 5 U.S.C. § 701, et seq.  This Court has

subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

10.     Venue is proper under 28 U.S.C. § 1391(e)(1) because Defendants are an officer of the United States acting in his official capacity and an agency of the United States, Defendants reside in this judicial district, and a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## PARTIES

11.     Plaintiff E.B. is an Ethiopian citizen and resident of Arba Minch, Ethiopia. E.B. intended to apply for the Diversity Visa Program in 2019, but was unable to do so because he did not have a passport and lacked the financial resources to obtain one.  He still does not have a passport and cannot afford to obtain one.  He intends to apply for the Diversity Visa Program in 2020 and in subsequent years (until he is able to immigrate to the United States), but the Passport Rule will prevent him from doing so as long as it is in effect.  But for the Passport Rule, E.B. would be able to submit an application for the Diversity Visa Program.

12.     Plaintiff K.K. is an Ivorian citizen and resident of Abidjan, Côte d'Ivoire. K.K. intended to apply for the Diversity Visa Program in 2019, but was unable to do so because he did not have a passport and lacked the financial resources to obtain one.  He still does not have a passport and cannot afford to obtain one.  He intends to apply for the Diversity Visa Program in 2020 and in subsequent years (until he is able to immigrate to the United States), but the Passport Rule will prevent him from doing so as long as it is in effect.  But for the Passport Rule, K.K. would be able to submit an application for the Diversity Visa Program.

13.     Plaintiff W.B. is a native of Ethiopia and a resident of Rockville, Maryland.  Plaintiff E.B. is her brother.  She hopes that her brother will one day reunify with her by immigrating to the United States.

14.     Plaintiff A.K. is a native of Côte d'Ivoire and a resident of New York, NY. Plaintiff K.K. is her brother.  She hopes that her brother will one day reunify with her by immigrating to the United States.

15.     Defendant Michael Pompeo is Secretary of State of the United States.  He is sued in his official capacity.  Under the Immigration and Nationality Act, he has the authority to issue regulations to implement the Diversity Visa Program, and in his official capacity, he issued the Passport Rule challenged in this action.  8 U.S.C. §§ 1153, 1154; *see also* 22 C.F.R. § 42.33(b)(1)(viii), (ix).

16.     Defendant U.S. Department of State is an agency of the United States within the meaning of the APA.  It is responsible for overseeing the United States visa and immigration program and adopting implementing regulations under the Immigration and Nationality Act.  8 U.S.C. §§ 1153, 1154; *see also* 22 C.F.R. § 42.33(b)(1)(viii), (ix).

## BACKGROUND

### The Diversity Visa Application Process

17.     The Diversity Visa Program was established in 1990 by the Immigration and Nationality Act of 1990, Pub. L. No. 101-649, § 131, 104 Stat. 4978, 4997 et seq. (codified at 8 U.S.C. § 1153(c)).  The new law created a mechanism by which potential immigrants from "low-admission states" of the world, or places that historically had been "adversely affected" by U.S. immigration laws, could emigrate to the United States.  *Id.*

18.     A "low-admission state" is one with "historically low rates of immigration to the United States," defined as fewer than 50,000 citizens admitted to the United States over the past five years.  8 U.S.C. § 1153(c)(1)(B).  For the most recent registration period, DV-2020, this included every country in the world except 18: Bangladesh, Brazil, Canada, mainland China, Colombia, the Dominican Republic, El Salvador, Haiti, India, Jamaica, Mexico, Nigeria,

Pakistan, Peru, the Philippines, South Korea, the United Kingdom (except Northern Ireland) and its dependent territories, and Vietnam.[6]

19.     The State Department issues diversity visas through a lottery.  The eligibility requirements for entering the lottery historically have been limited, enabling a wide and diverse pool of applicants to participate.  Aside from being born in a low-admission state, or having a spouse or parents born in a low-admission state, eligible applicants must have either a high school education or its equivalent, or "two years of work experience within the past five years that requires at least two years of training or experience to perform."  8 U.S.C. § 1153(c)(2).

20.     The first step to participating in the lottery involves registering for the Diversity Visa Program.  Applicants must register by completing an electronic entry form, which typically opens in October and closes in November.  Applicants must provide their name, gender, birth date, city and country of birth, country of eligibility, country of residence, recent photograph, email address, highest level of education, current marital status, and number of children.[7]  The application permits applicants to indicate if they do not have or know certain information.  *Id.*  There is no fee to register for the Diversity Visa Program.  *Id.*  Prior to the rule change, a valid passport was not required to register for the program.  During the registration

---

[6] U.S. Department of State, <u>Instructions for the 2020 Diversity Immigrant Visa Program (DV-2020)</u>, https://travel.state.gov/content/dam/visas/Diversity-Visa/DV-Instructions-Translations/DV-2020-Instructions-Translations/DV-2020-Instructions-English.pdf [https://perma.cc/XLH2-SMFE] (last visited Sept. 21, 2019).

[7] U.S. Department of State, <u>Instructions for the 2020 Diversity Immigrant Visa Program (DV-2020)</u>, https://travel.state.gov/content/dam/visas/Diversity-Visa/DV-Instructions-Translations/DV-2020-Instructions-Translations/DV-2020-Instructions-English.pdf [https://perma.cc/XLH2-SMFE] (last visited Sept. 21, 2019).

period for DV-2018, the most recent period for which data is publicly available, over 14 million

people registered.[8]

      21.    Approximately six months after the registration period, typically in May,

lottery "winners" can check to see if they have been selected.[9]  Winning the lottery does not

automatically provide a person with a visa to immigrate to the U.S.  It merely allows a winner to

apply for a visa.  *See id.*  Roughly two applicants are selected for every available diversity visa in

order to ensure that by the end of the process all 50,000 visas can be issued.[10]

      22.    For those selected to apply for a visa, the next step in the diversity visa

process is the gathering of supporting materials followed by an intensive screening.  This

screening includes a background check, criminal history check, review of biometric data and

supporting documentation, cross-checks with various watch-lists, and an in-person interview.[11]

Before the rule change, applicants needed a valid passport only at this stage, once they had been

---

[8] U.S. Department of State, <u>Diversity Visa Program, DV 2016-2018: Number of Entries Received During Each Online Registration Period by Country of Chargeability</u>, Diversity Visa Program Statistics, https://travel.state.gov/content/dam/visas/Diversity-Visa/DVStatistics/DV%20AES%20statistics%20by%20FSC%202016-2018.pdf [https://perma.cc/MQC4-DSRW] (last visited Sept. 21, 2019).

[9] *See* U.S. Department of State, <u>Diversity Visa Program, If You Are Selected</u>, https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry/diversity-visa-if-you-are-selected.html [https://perma.cc/39SG-JYQ4] (last visited Sept. 21, 2019) (entrants in two previous lotteries could check to see if they were selected as of May 1, 2018 and May 7, 2019 respectively).

[10] *See, e.g.*, U.S. Department of State, <u>DV 2015 – Selected Entrants</u>, https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry/dv-2015-selected-entrants.html [https://perma.cc/66QL-W2P4] (last visited Sept. 21, 2019) (125,514 applicants selected in 2014 for 50,000 visas).

[11] Bipartisan Policy Center, <u>Fact Sheet: Diversity Visa Lottery</u>, https://bipartisanpolicy.org/blog/fact-sheet-diversity-visa-lottery/ [https://perma.cc/DVC4-BDJJ] (last visited Sept. 21, 2019).

selected to apply for a visa.  Applying for a passport at this stage is often much easier than at the entry stage; if applicants know they have been selected in the diversity visa lottery, they can solicit financial or logistical assistance from family or their community, help that is often unavailable at the initial stage when an immigration visa to the United States remains unlikely.

23.     Applicants who are not chosen in the lottery are free to register again the following year, with no prejudice to their application.

24.     In FY 2018, 20,532 of the 49,713 total diversity visas that were issued, or over 41 percent, went to citizens of African countries.[12]

**The Rule Change**

25.     On June 5, 2019, the State Department published the Interim Final Rule, 84 Fed. Reg. 25,989 (June 5, 2019) (codified at 22 C.F.R. § 42.33).  Although the State Department called it an "Interim" rule, it was effective immediately with no prospect for revision.

26.     The new rule requires all applicants to provide a valid passport number, country or authority of passport issuance, and expiration date on the electronic entry form.  84 Fed. Reg. at 25,989.  Whereas in prior years only the roughly 100,000 individuals selected to apply for a visa would have to possess or obtain valid passports before their visas would be issued, the new rule would require all applicants (a pool of 14 million people in the 2018 lottery) to already possess a valid passport.

---

[12] U.S. Department of State, Immigrant Number Use for Visa Issuances and Adjustments of Status in the Diversity Immigrant Category, Report of the Visa Office 2018, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2018AnnualReport/FY18 AnnualReport%20-%20TableVII.pdf [https://perma.cc/KCQ3-MNUX] (last visited Sept. 21, 2019).

27.     The State Department claims it promulgated this new rule because it "has historically encountered significant numbers of fraudulent entries for the [diversity visa] program each year. . . . Requiring that each entry form include a valid passport number at the time of the [Diversity Visa] Program entry will make it more difficult for third parties to submit unauthorized entries, because third parties are less likely to have individuals' passport numbers." 84 Fed. Reg. at 25,990.

28.     The rule introduces a new formal requirement for application, which will have the immense practical effect of barring many – possibly millions – of applicants from entering the lottery.  It also likely will alter substantially the profile of the applicant class, decreasing its diversity by creating a preference for applicants from wealthier nations where passports are more easily obtained.

29.     The APA requires that for every rule, with limited exceptions, there must be an opportunity for public participation in the rulemaking, through notice of the proposed rule and an opportunity to comment prior to its issuance.  5 U.S.C. § 553.

30.     The State Department published the Passport Rule as an interim final rule, without complying with notice and comment rulemaking procedures.  Although the Department allowed the public to submit comments for 30 days after the Rule went into effect, 84 Fed. Reg. at 25,989, this post-enactment comment period did not comply with the APA.

31.     The State Department claims that the Passport Rule was "exempt from notice and comment under the foreign affairs exception" of the APA.  84 Fed. Reg. at 15,990 (citing 5 U.S.C.§ 553(a)(1)).

32.     The foreign affairs exception "is not to be loosely interpreted to mean any function extending beyond the borders of the United States, but only those 'affairs' which so

affect relations with other Governments, that, for example, public rule-making provisions would clearly provoke definitely undesirable international consequences." *Hou Ching Chow v. Attorney Gen.*, 362 F. Supp. 1288, 1290 (D.D.C. 1973) (quoting S. Rep. No. 79-752 (1946)).

33.     In support of this exemption, the State Department claimed that the "rule clearly and directly impacts a foreign affairs function of the United States" because it "pertains to a visa program which serves as a clear tool of diplomacy and outreach to countries around the world." 84 Fed. Reg. at 15,990. The State Department further claimed that "this rule addresses a vulnerability in the current application process by making it more difficult for third parties to submit fraudulent or unauthorized entries, a practice that has significant consequences." *Id.*

34.     The State Department further asserted that the Diversity Visa Program "serves as an outreach tool" to "foreign populations" and is an "important public diplomacy tool." *Id*.

35.     The State Department provided no evidence or support for the principle that 50,000 visas issued at random across the world serve as an "important public diplomacy tool," much less that introducing a substantial barrier to applicants averts "definitely undesirable international consequences." *Id.* The availability of the diversity visa to foreign citizens has, at most, a minuscule effect on "foreign populations."[13]

36.     Even accepting the State Department's contention that the Diversity Visa Program is an "important public diplomacy tool," the State Department did not provide any

---

[13] Citizens of Ethiopia, a country of over 100 million, received 2,424 diversity visas last year, among the greatest number of diversity visas issued to citizens of any one country. U.S. Department of Homeland Security, Table 11: Persons Obtaining Lawful Permanent Resident Status by Broad Class of Admission and Region and Country of Last Resident: Fiscal Year 2017, 2017 Yearbook of Immigration Statistics, https://www.dhs.gov/immigration-statistics/yearbook/2017/table11 [https://perma.cc/ERQ2-S2VA] (last visited Sept. 21, 2019).

explanation of how *abandoning the notice-and-comment period* for the Passport Rule would negatively affect diplomacy with foreign nations or populations, or provoke undesirable consequences to foreign affairs.  If anything, it is the adoption of the Passport Rule with no notice or opportunity for comment that could harm diplomatic efforts and outreach to "foreign populations" given the Rule's severely restrictive effects.

37.     The State Department also claims that the Passport Rule is needed to protect against "fraudulent entries . . . including entries submitted by criminal enterprises on behalf of individuals without their knowledge."  84 Fed. Reg. at 25,990.  The State Department asserts that "requiring that each entry form include a valid passport number at the time of the DV Program entry will make it more difficult for third parties to submit unauthorized entries, because third parties are less likely to have individuals' passport numbers."  *Id*.  But the Passport Rule does nothing to prevent bad actors from using information from fake or stolen passports to enter the Diversity Visa Program.  Indeed, in many of the countries most affected by the Passport Rule, it is easier for "criminal enterprises" to obtain passports than individuals, and passport data theft is a significant worldwide problem.[14]  Moreover, criminal enterprises are less likely to change their behavior as a result of this rule than individuals, meaning that the Passport Rule will exclude genuine applicants with little effect on fraudulent applications.

**The Effect of the New Rule**

38.     The new rule requiring passports at the initial application stage is a

---

[14] *See, e.g.*, David E. Sanger, Marriott Concedes 5 Million Passport Numbers Lost to Hackers Were Not Encrypted, N.Y. Times, (Jan. 4, 2019), https://www.nytimes.com/2019/01/04/us/politics/marriott-hack-passports.html [https://perma.cc/B8HR-VM2T]; Kate Fazzini, Here's How Criminals Use Stolen Passport Information, CNBC, (July 5, 2019), https://www.cnbc.com/2019/07/05/how-criminals-use-stolen-passport-information.html [https://perma.cc/9E6F-HHL4].

prohibitive and onerous requirement for many applicants, especially those from African

countries.

39.     The majority of people around the world do not possess a valid passport.

Even in the United States, a wealthy and developed nation, only approximately 40 percent of

Americans have valid U.S. passports.[15]

40.     In many African countries, including Ethiopia and Côte D'Ivoire,

obtaining a passport is often an arduous if not impossible undertaking.  One reason is that the

cost of acquiring a new passport can be high relative to average income.  For example, in the

Democratic Republic of Congo, a passport costs $185, a significant portion of the average per

capita income of $456 per year.[16]  In Ethiopia, the fee for a passport is approximately $20, which

is the average monthly income for over 80 percent of the population.  (Ex. A, Declaration of

Solomon Teshome Retta ("Solomon Decl."), at ¶ 9.)  People who need passports often must take

time off from work and travel long distances, particularly those who do not live in or near large

cities with passport offices.  (Solomon Decl. ¶¶ 6-8.)  This adds further cost and burden that, in

parts of the world where average income and employment is low, can be prohibitive.

41.     In addition to financial hardship, administrative hurdles make acquiring a

new passport time-consuming and impractical in many African countries.  Just months ago,

Zimbabwe did not have enough foreign currency to purchase the ink and paper required to print

new passports, and Zimbabweans had to sleep outside of the passport office to fill out passport

---

[15] U.S. Department of State, Passport Statistics,
https://travel.state.gov/content/travel/en/passports/after/passport-statistics.html
[https://perma.cc/H3G3-PKMU] (last visited Sept. 21, 2019).

[16] Conor Gaffey, Why Is a Congolese Passport More Expensive Than a U.S. One?, Newsweek
(April 18, 2017), https://www.newsweek.com/congo-passport-joseph-kabila-585530
[https://perma.cc/9MF6-GYKA].

applications.[17]  Uganda also has suffered shortages of materials required to print new passports,

resulting in lengthy delays.[18]  In Ethiopia, in order to obtain a passport one must first possess a

resident ID card and a birth certificate, and in order to obtain either of these documents

Ethiopians must navigate a thicket of rules and requirements.  (Solomon Decl. ¶¶ 10-12.)

Moreover, according to recent news reports, Ethiopia is experiencing a shortage of passport

books because of a lack of hard currency, leading to 45-day delays between application for and

issuance of passports.[19]  As would-be diversity visa applicants in Ethiopia learn of the Passport

Rule, these delays are likely to increase.  In these and many other African countries, obtaining a

new passport is a significant investment of time and money, and imposes a prohibitively steep

cost for the small chance of being chosen through the visa lottery.

       42.    As a result of the State Department's promulgation of the rule without

notice and comment, the public had little information about the new requirement before the

lottery period opened in October 2019.  Until shortly before the lottery opened, the Diversity

Visa Program website did not contain information about the rule change,[20] nor had the written or

---

[17] Farai Mutsaka, "We are trapped": Zimbabwe's Economic Crunch Hits Passports, Associated Press News (June 15, 2019), https://www.apnews.com/217ddb22679a4c2f881f0d1e2391239c [https://perma.cc/QDQ5-FXFF].

[18] Misari Thembo Kahungu, Passport Shortage Hits Labour Export Agencies, Daily Monitor (April 5, 2019), https://www.monitor.co.ug/News/National/Passport-shortage-Siminyu-labour-export-agencies-Kania/688334-5059004-15pvihez/index.html [https://perma.cc/A8NU-ZN2P].

[19] Dawit Astatike, Obtaining Passport Still Delayed, Capital (Sept. 16, 2019), https://www.capitalethiopia.com/capital/obtaining-passport-still-delayed/ [https://perma.cc/X33Y-YASA]; Kalaeb Girma, Ethiopia: New Directive Eases Passport Application Process, allAfrica (Aug. 17, 2019), https://allafrica.com/stories/201908220319.html [https://perma.cc/D5J3-S95N].

[20] See U.S. Department of State, Diversity Visa Program – Entry, https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry.html [https://perma.cc/XBJ4-XFHQ] (last visited Sept. 21, 2019).

video instructions available on the State Department's website been updated.[21]  Because the
Department failed to provide any notice, or opportunity for public comment, many potential
applicants were not aware of the new requirement or did not become aware of the new
requirement with sufficient time to procure a passport during the short month-long period during
which program applications were accepted.  Under the new rule, applications submitted without
the required passport number will be rejected.  22 C.F.R. § 42.33(b)(1)(ix).

43.     The State Department accepted applications for the 2019 diversity visa
lottery from October 2 to November 5, 2019.  Individuals, including Plaintiffs E.B. and K.K.,
who did not possess a valid passport and did not fall within one of the narrow exceptions within
the rule, were not able to participate.

44.     The effect of the new rule will be to continue, in future lotteries, to
exclude significant numbers of diversity visa applicants from African countries, who currently
make up a large proportion of diversity visa recipients.

45.     The Trump Administration has made its hostility towards the diversity
lottery clear.  In November 2017, President Trump expressed his intent to eradicate the Diversity
Visa Program, declaring: "We are fighting hard for Merit Based immigration, no more Democrat
Lottery Systems," and that he would be "starting the process of terminating the diversity lottery

---

[21] *See* U.S. Department of State, <u>Instructions for the 2020 Diversity Immigrant Visa Program
(DV-2020)</u>, https://travel.state.gov/content/dam/visas/Diversity-Visa/DV-Instructions-
Translations/DV-2020-Instructions-Translations/DV-2020-Instructions-English.pdf
[https://perma.cc/7QBF-CZLF] (last visited Sept. 21, 2019); U.S. Department of State, <u>U.S.
Diversity Visa Program Tutorial: Submitting an Entry</u>,
https://www.youtube.com/watch?v=tOQlh2d2EbQ&feature=youtu.be (last visited Sept. 21,
2019).

program," because "we have to get less politically correct."[22]  In February 2019 he described the Diversity Visa Program as "a horror show, because when countries put people into the lottery, they're not putting you in; they're putting some very bad people in the lottery."[23]  In August 2019, he inaccurately and disparagingly described the lottery process: "you pick people out of the lottery.  Well let's see, this one is a murderer, this one robbed four banks, this one I better not say, this one another murderer, ladies and gentlemen, another murderer. . . . Do you think [countries] are going to put their great citizens . . . into the lottery?  Look at the people they put into these lotteries."[24]

46.     The President also has complained about immigrants coming from African nations, asking "why do we want all these people from shithole countries coming here?" and "[w]e should have more people from places like Norway."[25]

47.     The Passport Rule, which has the effect of excluding significant numbers of citizens of African countries from registering for the Diversity Visa Program, represents an attempt by this Administration to curb applications from poorer countries, reducing the diversity of applicants and frustrating Congress's intent in enacting the Diversity Visa Program.

---

[22] Priscilla Alvarez, <u>The Diversity Visa Program Was Created to Help Irish Immigrants</u>, The Atlantic, (Nov. 1, 2017), https://www.theatlantic.com/politics/archive/2017/11/diversity-visa-program/544646/ [https://perma.cc/WG6M-WKTS].

[23] Calvin Woodward & Hope Yen, <u>AP Fact Check: Trump Spins Fiction About Diversity Visas</u>, Associated Press, (Feb. 18, 2019), https://www.apnews.com/56e8c95dab1345bbac9d065eaa1b8152 [https://perma.cc/63NW-VML2].

[24] <u>President Trump in Cincinnati, Ohio</u>, CNN, (Aug. 1, 2019), https://www.c-span.org/video/?463078-1/president-trump-holds-campaign-rally-cincinnati-ohio.

[25] Eli Watkins and Abby Philip, <u>Trump Decries Immigrants from "Shithole Countries" Coming to US</u>, CNN (Jan. 12, 2018), https://www.cnn.com/2018/01/11/politics/immigrants-shithole-countries-trump/index.html [https://perma.cc/MB3F-64E7].

**Harms to Plaintiffs**

48.     Plaintiffs E.B. and K.K. are individual citizens of countries affected by the Passport Rule, who, but for the rule change, would apply for the Diversity Visa Program in 2020 and in subsequent years.  Plaintiffs W.B. and A.K. are family members of E.B. and K.K., who reside in the United States, and for whom the Diversity Visa Program provides opportunities for reunifying with their relatives.  The Passport Rule causes each Plaintiff significant harm.

49.     Plaintiff E.B. is a resident of Arba Minch, Ethiopia.  He has lived in Ethiopia his entire life, and has never left the country.  He has operated a mechanic's shop for the last three years.  He earns approximately $68.50 per month.  He has applied for the Diversity Visa Program three times in the past, most recently in 2016.  He intended to apply again in October 2019, but was unable to do so because of the Passport Rule.  Until the promulgation of the Passport Rule, he satisfied the requirements of the Diversity Visa Program.

50.     E.B. has never owned an Ethiopian passport, and has never attempted to apply for one.  The $20 cost of an Ethiopian passport is a substantial portion of E.B.'s monthly income.  Applying for a passport in Ethiopia will require him to incur additional costs.  Arba Minch is hours by car from Awassa, the closest city in which he can apply for a passport.  E.B. does not own a car, and if he travels to Awassa by bus, it will cost him over $11 one way.  He will have to make this trip twice: once to apply for, and once again to retrieve, his passport.  Furthermore, he will have to close his mechanic's shop for at least two days, incurring lost income of approximately $7 to $14.  Thus, just applying for a passport will cost E.B. nearly a month's income.

51.     This cost does not include the indirect costs associated with acquiring the necessary supporting documents for his passport application.  Before E.B. can even apply for a passport, he will have to apply for and obtain documentation of his birth, parentage, residence,

and education.  This would require additional travel, cost, and lost income.  The financial burden of applying for and acquiring a passport just to enter the Diversity Visa Program is prohibitively high for E.B.  If he were selected in the Diversity Visa Program, he could manage to incur the substantial costs involved to obtain a passport with the assistance of his family and community.  This help is not available merely for his application for the Diversity Visa Program.

52.     Even if E.B. could manage to incur the financial cost to apply for a passport, the Passport Rule would harm him by forcing him to expend resources that he would not otherwise have merely to apply for the Diversity Visa Program.

53.     E.B. intends to apply for the Diversity Visa Program in 2020 and in subsequent years (until he is able to immigrate to the United States), but the Passport Rule will prevent him from applying to the Program as long as it remains in effect.  Further, Plaintiff W.B., E.B.'s sister who resides in Rockville, Maryland, will lose an opportunity to reunify with her brother each year that the Rule remains in effect.

54.     Plaintiff K.K. is a resident of Abidjan, Côte d'Ivoire, where he has lived his entire life.  He has worked for the past three years for a company that manufactures plastics for tires, working six days a week.  He earns a base salary of approximately $58 per month.  Some months he earns more, but his highest income in a single month totaled approximately $160.  Since 2013, he has applied for the Diversity Visa Program five times, missing only the 2018 and 2019 lotteries during that time span.  He intended to apply in October 2019, but was unable to do so because of the Passport Rule.  Until the promulgation of the Passport Rule, he satisfied the requirements of the Diversity Visa Program.

55.     K.K. has never owned an Ivorian passport.  To acquire an Ivorian passport, K.K. would have to pay $80, more than his average monthly income.  In addition to the

enormous cost, K.K. faces significant administrative burdens in applying for a new passport.  He

first would require a national identification card, which is itself difficult, costly, and time-

consuming to obtain.  To acquire a national identification card, he would need to procure two

original birth certificates, a citizenship certificate, and a temporary identification card.  Obtaining

each of these is itself time-consuming and expensive.  The cost of obtaining these documents is

approximately $40.  Moreover, he would be required to take time off from work, which is

logistically difficult and would cost him income.

        56.     K.K. thus would have to pay at least $120 just to acquire a passport, an

amount more than double his monthly base salary and a little less than what he made in his most

lucrative month.  This does not include the costs associated with traveling to and from the

various administrative offices in order to obtain the passport and supporting documents, and the

lost income from time spent not working.  The financial burden of applying for and acquiring a

passport just to enter the Diversity Visa Program is therefore prohibitively high for K.K.  If he

were selected in the Diversity Visa Program, he could manage to incur the substantial costs

involved to obtain a passport with the assistance of his family and community.

        57.     Such help is not available at the application stage for the Diversity Visa

Program.  In advance of the 2019 lottery, K.K. asked his sister, Plaintiff A.K., for financial

assistance obtaining an Ivorian passport, but she was unable to help.  K.K. has not asked other

relatives in Côte d'Ivoire for financial assistance in obtaining a passport because most of them

are unemployed, while he has a job.  K.K. cannot in good conscience request monetary

assistance from relatives who are less economically secure than he is to finance his participation

in the lottery.  Were he to be selected, he could request this monetary assistance with the

knowledge that he would be able to repay the loan by earning a greater income in the United States.

58.     Even if K.K. were able to muster the financial resources to apply for a passport, the Passport Rule would harm him by forcing him to expend resources that he would not otherwise have expended merely to apply for the Diversity Visa Program.

59.     K.K. intends to apply for the Diversity Visa Program in 2020 and in subsequent years (until he is able to immigrate to the United States), but the Passport Rule will prevent him from applying to the Program as long as it remains in effect.  Further, A.K., K.K.'s sister who resides in New York City, will lose an opportunity to reunify with her brother each year the Rule remains in effect.

60.     Because the State Department promulgated the Passport Rule without first allowing public comment, Plaintiffs received no meaningful opportunity to inform the Department of the Rule's significant negative impact on them.  Had the Department complied with the APA's notice-and-comment requirements, Plaintiffs would have participated in formulation of the final rule by submitting comments, and the Department might have been able to identify alternative methods of achieving its objective of combatting application fraud without effectively precluding Plaintiffs E.B., K.K., and others like them from applying to the Diversity Visa Program.

**CLAIM FOR RELIEF**
**(ADMINISTRATIVE PROCEDURE ACT)**

61.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

62.     The Rule is subject to the APA's requirement for notice and opportunity for comment prior to the promulgation of regulations.  5 U.S.C. § 553(b), (c).

63.     The Secretary of State failed to provide notice and an opportunity to comment on the Rule in a timely manner, violating the APA.

64.     The Rule does not fall within the APA's foreign affairs exception, 5 U.S.C. § 553(a)(1), and the Secretary of State has not asserted any other APA exception, nor is any other applicable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

(a)     A declaration pursuant to 28 U.S.C. § 2201 that the Passport Rule is unlawful and invalid;

(b)     A permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Passport Rule;

(c)     An order awarding Plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law;

(d)     Such other and further relief as the Court deems equitable, just, and proper.

Dated:   December 17, 2019

FRIEDMAN KAPLAN SEILER &
    ADELMAN LLP

INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION

/s/ Seth Wayne
Seth Wayne (D.C. Bar No. 888273445)

Anil K. Vassanji*
7 Times Square
New York, NY 10036-6516
(212) 833-1100
avassanji@fklaw.com

Jonathan L. Backer (D.C. Bar No. 1613073)
Robert D. Friedman (D.C. Bar No. 1046738)
Mary B. McCord (D.C. Bar No. 427563)
600 New Jersey Ave NW
Washington, DC 20001
(202) 662-9042

  *Admitted pro hac vice

sw1098@georgetown.edu

*Attorneys for Plaintiffs.*