# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

E.B. *et al.*,

               *Plaintiffs*,

      v.

U.S. DEPARTMENT OF STATE *et al.*,

              *Defendants*.

Civil Action No. 19-2856 (TJK)

## <u>MEMORANDUM OPINION</u>

This case is about an interim final rule issued by the State Department that changed the requirements for individuals applying to the Diversity Visa Program, otherwise known as the visa lottery. Under the rule, individuals must possess a valid passport before they can participate in the lottery. Plaintiffs, two foreign nationals and their U.S.-based relatives, do not challenge the substance of the rule. Rather, they take issue with the way it was adopted because it was not subject to the Administrative Procedure Act's notice-and-comment procedures. Defendants have moved to dismiss, arguing that Plaintiffs fail to state a claim for which the Court can grant them relief because the rule was properly enacted. And Plaintiffs have moved for summary judgment, arguing to the contrary. For the reasons explained below, the Court finds that the rule was unlawfully promulgated without notice-and-comment procedures. Thus, it will deny Defendants' motion to dismiss, grant Plaintiffs' motion for summary judgment, and vacate the rule.

## I. Background

### A. Diversity Visa Program

The Immigration and Nationality Act of 1990 ("INA") established the Diversity Visa Program. Pub. L. No. 101-649, § 131, 104 Stat. 4978, 4997 *et seq*. (1990) (codified at 8 U.S.C.

§ 1153(c)).  The law allows the State Department to issue 55,000 diversity visas annually to indi-

viduals from countries and regions that have historically sent fewer immigrants to this country.[1]

*See id.*; 8 U.S.C. § 1151(e).  The purpose is "to diversify the immigrant population in the United

States."  Visas: Diversity Immigrants, 84 Fed. Reg. 25,989, 25,990 (June 5, 2019) (codified at 22

C.F.R. § 42.33).  According to the State Department, the program "serves as a clear tool of diplo-

macy and outreach to countries around the world."  *Id.*

Potential immigrants are selected for the program "strictly in a random order established

by the Secretary of State."  8 U.S.C. § 1153(e)(2).  The process begins with the diversity visa

lottery.  Interested foreign nationals must apply during a set registration window at least 30 days

long, usually beginning sometime in early October and ending in early November.  22 C.F.R.

§ 42.33(b)(3).  After the registration period ends, the State Department then sorts the entries into

different world regions, 8 U.S.C. § 1153(c)(1)(F), and selects "through a randomized computer

drawing" a certain number of registrants who "may then apply for a diversity visa or, if present in

the United States, apply for adjustment of status," 84 Fed. Reg. at 25,989.

**B.**      **The Passport Rule**

The Secretary of State may issue regulations governing the information that lottery regis-

trants must provide to the State Department.  8 U.S.C. § 1154(a)(1)(I)(iii).  On June 5, 2019, the

State Department promulgated the Passport Rule, which requires that individuals who seek to par-

ticipate in the lottery possess a valid passport when they register.  84 Fed. Reg. at 25,989; *see also*

22 C.F.R. § 42.33(b)(viii).  Before enactment of the rule, a lottery participant had to obtain a pass-

port only if she was selected—*i.e.*, if she won the lottery—and then sought to apply for a diversity

---

[1] Five thousand of these visas are allocated under the Nicaraguan Adjustment and Central Ameri-
can Relief Act, Pub. L. No 105-100, § 203(d), 111 Stat. 2160, 2199 (1997).

visa.  *See* 84 Fed. Reg. at 25,989; 22 C.F.R. § 42.64(b).  Now, the Passport Rule requires a partic-

ipant to obtain a passport at an earlier point in the process, before the participant knows whether

she can apply for a diversity visa.  84 Fed. Reg. at 25,989; *see also* 22 C.F.R. § 42.33(b)(viii).

According to the State Department, the rule will help prevent fraud.  *See* 84 Fed. Reg. at 25,990.

     The State Department promulgated the Passport Rule as an interim final rule, and so it

became effective upon publication.  *See* 84 Fed. Reg. at 25,989.  Although the State Department

informed the public that it would accept comments on the rule for 30 days, it invoked the foreign

affairs function exception of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(a)(1), and

dispensed with the standard notice-and-comment procedures, *see* 84 Fed. Reg. at 25,990.

## C.      The Instant Case

     Plaintiffs are four individuals.  Plaintiffs E.B. and K.K. live in Africa.  *See* ECF Nos. 39

¶ 1 & 38-2 ¶ 1.  They both applied to the Diversity Visa Program multiple times before Defendants

promulgated the Passport Rule.  *See* ECF No. 39 ¶ 8; ECF No. 38-2 ¶ 6.  But neither can commit

to the costs of obtaining a passport only to enter a lottery.  *See* ECF No. 39 ¶ 17; ECF No. 38-2

¶ 15.  Their siblings, Plaintiffs W.B. and A.K., live in the United States and hope that the Diversity

Visa Program will enable them to emigrate here.  *See* ECF Nos. 38-4 & 38-3.

     Plaintiffs sued the State Department and Michael Pompeo in his official capacity as Secre-

tary of State, alleging that the promulgation of the Passport Rule without notice-and-comment

rulemaking was unlawful under the APA.[2]  *See* ECF No. 1.  Plaintiffs also moved for a preliminary

injunction, ECF No. 3, which this Court denied, *E.B. v. U.S. Dep't of State*, 422 F. Supp. 3d 81

(D.D.C. 2019); *see also* ECF Nos. 20 & 21.  Plaintiffs then filed an amended complaint, raising

---

[2] The original complaint also included another individual as a plaintiff, ECF No. 1, but Plaintiffs voluntarily dismissed him when they amended because he "did not face insurmountable financial obstacles to obtaining a passport," ECF No 38-1 at 17.

the same arguments and explaining that the Passport Rule continues to prevent E.B. and K.K. from participating in future diversity lotteries because neither can afford a passport just for applying to the Diversity Lottery Program. *See* ECF No. 27. Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the State Department provided Plaintiffs with legally sufficient notice and an opportunity to respond and in any event that the "foreign affairs function" exception to the APA's notice-and-comment requirements applied. ECF No. 28. Plaintiffs moved for summary judgment. ECF No. 38.

## II.   Legal Standards

"A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint[.]" *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017). "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). "But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Id.* "To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Summary judgment is usually appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31–32 (D.D.C. 2010) (alteration in original) (citation omitted), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011). In "a case involving review of a final agency

action under the [APA], however, the Court's role is limited to reviewing the administrative rec-ord, so the standard set forth in Rule 56[] does not apply."[3]  *Id.* at 32.  "The entire case on review is a question of law, and only a question of law."  *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  As a result, "when a district court is reviewing agency action . . . the legal questions raised by a 12(b)(6) motion and a motion for summary judgment are the same. "  *Id.* at 1222–23.

## III.    Analysis

This case turns on one question: whether Defendants had to comply with the APA's notice-and-comment requirements when promulgating the Passport Rule.  They did.  Because Defendants did not follow those procedures, the Passport Rule was enacted unlawfully, and must be vacated.[4]

### A.        The Passport Rule Was Enacted Unlawfully

The APA generally requires substantive rules to be promulgated through notice-and-comment rulemaking.  At least "30 days before" the rule's effective date, a "notice of proposed rule making" must be "published in the Federal Register."  5 U.S.C. § 553(d) & (b).  The notice shall

---

[3] Defendants have not produced the administrative record in this case.  *See* ECF No. 42 at 16.  But the record is unnecessary since the Court finds that notice-and-comment rulemaking was required. *See Alphapointe v. Dep't of Veterans Affs.*, 475 F. Supp. 3d 1, 12 (D.D.C. 2020) ("Resolving Plaintiffs' challenge . . . requires no obvious need for the administrative record" because "Plain-tiffs do not challenge the manner of rulemaking" but "whether rulemaking was required in the first place.").  In any event, the Court appears to possess it.  Defendants attached to their opposition to Plaintiffs' motion for summary judgment the appendix to the administrative record, which lists five documents.  *See* ECF No.  42-1.  Four of those documents—the interim final rule here, two other final rules, and a Second Circuit opinion—are public records.  *Id.*  And Plaintiffs obtained the only nonpublic record, an "Action Memo for the Assistant Secretary of Consular Affairs," through a Freedom of Information Act request and filed it on the docket.  *See* ECF No. 44-1

[4] For the reasons detailed in this Court's prior opinion denying Plaintiffs' motion for a preliminary injunction, the Court finds that Plaintiffs' claims are justiciable.  *See E.B.*, 422 F. Supp. 3d at 86–87.  At least one Plaintiff has standing and falls within the zone of interests of the INA.  *Id.*  De-fendants do not argue otherwise in either their motion to dismiss or their opposition to Plaintiffs' motion for summary judgment.

inform the public of "the time, place, and nature of public rule making proceedings"; refer "to the legal authority under which the rule is proposed"; and detail "either the terms of substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b).  The agency then must "give interested persons an opportunity" to comment on the proposed rule by submitting "written data, views, or arguments." *Id.* § 553(c).

Defendants took none of these steps before issuing the Passport Rule.  *See* 84 Fed. Reg. at 25,989.  Instead, they claim that one of the APA's exceptions to the above requirements—the "foreign affairs function" exception—applies.  They also argue that their provision of *post*-promulgation notice and comment was "sufficient" in some way.  They are wrong on both counts.

### 1.    Foreign Affairs Function Exception

The D.C. Circuit has instructed that exceptions to the APA's notice-and-comment requirements must be "narrowly construed" and "reluctantly countenanced," despite their potentially broad sweep.  *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980).  Under the foreign affairs function exception, an agency can dispense with notice-and-comment procedures "to the extent that there is involved . . . a military or foreign affairs function of the United States."  5 U.S.C. § 553(a)(1).  There is sparse case law in—or outside—this Circuit construing this exception.[5]

The Court starts, as it must, with the text of the statute:

(a) This section [detailing the notice-and-comment requirements] applies, according to the provisions thereof, except to the extent that there is involved --
    (1) a military or foreign affairs function of the United States; or

---

[5] The Court conducted a similar analysis in *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020), to decide whether the foreign affairs function exception applied to a different interim final rule.  The Court held that it did not, and Government appealed that decision.  While the appeal was pending, a final rule was promulgated that superseded the interim final rule at issue.  The Government thus moved to dismiss the appeal and vacate this Court's decision under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).  Plaintiffs opposed, and that motion remains pending.  *See I.A. v. Garland*, Nos. 20-5271, 20-5273 (D.C. Cir.).

      (2) a matter relating to agency management or personnel or to public property,
          loans, grants, benefits, or contracts.

5 U.S.C. § 553(a).  The first relevant phrase is "to the extent that there is involved."  Although this case concerns the applicability of subsection (a)(1), the D.C. Circuit has interpreted that phrase in the context of applying subsection (a)(2)—the "benefits" exception.  Specifically, in *Humana of South Carolina, Inc. v. Califano*, the Circuit instructed—consistent with the duty to "narrowly construe" and "reluctantly countenance" such exceptions, *New Jersey*, 626 F.2d at 1045—that "to the extent that any one of the enumerated categories is *clearly and directly* involved in the regulatory effort at issue, the Act's procedural compulsions are suspended."  590 F.2d 1070, 1082 (D.C. Cir. 1978) (citations and quotations omitted) (emphasis added).  As a result, a rule falls within the foreign affairs function exception only if it "clearly and directly" involves "a foreign affairs function of the United States."

      The APA does not define the next key terms—"foreign affairs" or "function"—and so the Court turns to dictionaries in use at the time of the APA's enactment.[6]  The definition of "foreign affairs" is reasonably straightforward: it refers to the conduct of international relations between sovereign states.  *See* Webster's New International Dictionary 988 (2d ed. 1945) (defining foreign affairs to include "matters having to do with international relations and with the interests of the home country in foreign countries").  The meaning of "function," on the other hand, is less clear.  The 1945 version of Webster's New International Dictionary defines it as "[t]he natural and proper action of anything; special activity," "[t]he natural or characteristic action of any power or faculty,"

---

[6] *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 130 (D.C. Cir. 2018) (en banc) (Griffith, J., concurring in the judgment) (noting that undefined terms are to be given "their ordinary meaning," and that courts "generally begin[] with dictionaries"), *abrogated on other grounds by Seila Law LLC v. Consumer Fin. Prot. Bureau*, --- U.S. ---- , 140 S. Ct. 2183 (2020); *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228–29 (1994) (observing that the time of enactment is "the most relevant time for determining a statutory term's meaning").

or "[t]he course of action which peculiarly pertains to any public officer in church or state; the activity appropriate to any business or profession; official duty." *Id.* at 1019. "Function" thus appears to narrow the exception further; to be covered, a rule must involve activities or actions that are especially characteristic of foreign affairs. Applying these definitions, then, a foreign affairs function encompasses activities or actions characteristic to the conduct of international relations. And to sum up, to be covered by the foreign affairs function exception, a rule must clearly and directly involve activities or actions characteristic to the conduct of international relations.

Some circuits have adopted a test that Defendants appear to rely on here that would permit the exception to be invoked when notice-and-comment procedures "would provoke definitely undesirable international consequences." *Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (quotation omitted); *see also Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008); *Jean v. Nelson*, 711 F.2d 1455, 1478 (11th Cir. 1983); *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980). Defendants say that subjecting the Passport Rule to notice-and-comment procedures would provoke undesirable consequences because it would require them to disclose to the public sensitive information received from other countries about fraud related to the Diversity Lottery Program. Defendants have not provided a factual basis to support any of that.[7] But in any event, the D.C. Circuit has not adopted this test. And this Court declines to do so for three reasons.

---

[7] Defendants say that the State Department reached its "conclusions regarding potential unscrupulous activities and efforts to commit visa fraud based on information it received during its ongoing diplomatic interactions with diversity visa-eligible countries." ECF No. 28-1 at 23–24. "[O]pening up the [Passport Rule] to notice and comment," Defendants claim, "would require the Department to elaborate on international law enforcement investigations and information exchanges conducted with different diversity visa eligible countries," and it "would likely lead to the public airing of maters that might enflame or embarrass relations with other countries." *Id.* at 24 (cleaned up) (quoting *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995)). But Defendants never explain—in

First, this test is unmoored from the legislative text; it is lifted from the House Report relating to the APA.  *See* H.R. Rep. No. 79-1980, at 257 (1946).  And as the Supreme Court has repeatedly instructed, "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).  Thus, the Court declines to "rest[] its interpretation on legislative history," which "is not the law." *Epic Sys. Corp. v. Lewis*, --- U.S. ----, 138 S. Ct. 1612, 1631 (2018).

Second, requiring a rule to have undesirable consequences would render the foreign affairs function exception superfluous.  Another exception already applies "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or con-trary to the public interest."  5 U.S.C. § 533(b)(B).  So if notice-and-comment rulemaking "would clearly provoke definitely undesirable international consequences" then this so-called "good cause" exception would be available.  *Mast Indus., Inc. v. Regan*, 596 F. Supp. 1567, 1581 (Ct. Int'l Trade 1984) (Requiring negative consequences "would render the 'military or foreign affairs function' superfluous since the 'good cause' exception . . . would apply.") (citation omitted)).  In-deed, several courts have relied on the "international consequences" test to find both the foreign affairs function exception and the good cause exception satisfied on largely the same facts.  *See Nademi v. INS*, 679 F.2d 811, 814 (10th Cir. 1982); *Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981); *Yassini*, 618 F.2d at 1360–61.

---

their briefing or in, for example, a sworn declaration from a relevant official—why any sensitive information would necessarily have to be disclosed to the public during notice-and-comment pro-cedures.  And this argument is fatally undercut by Defendants' request for public comment and their response to those comments *after* the Rule was in effect.  *See* 84 Fed. Reg. at 25,989; *see also Supporting Statement for Paperwork Reduction Act Submission, Electronic Diversity Visa Lottery (EDV) Entry Form, OMB Number 1405-0153, DS-5501* (Aug. 29, 2019), *available at* https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201908-1405-006.

Third, the Second Circuit recently clarified that it applies this "international consequences" test exclusively to areas of the law "that only *indirectly* implicate international relations" rather than "quintessential foreign affairs functions such as diplomatic relations and the regulation of foreign missions," which it characterized as "different." *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010) (emphasis added). According to the Second Circuit, the latter circumstances "clearly and directly involve a foreign affairs function, and so fall within the exception without a case-by-case iteration of specific undesirable consequences." *Id.* (citations and quotations omitted) (emphasis added). But this approach conflicts with the D.C. Circuit's admonition that a rule must "clearly and directly" involve the basis for the asserted exception—here, the foreign affairs function—full stop, without exception. *Humana*, 590 F.2d at 1082.

Thus, at least under the law of this Circuit, the foreign affairs function exception covers heartland cases in which the rule itself directly involves the conduct of foreign affairs. One example is when the rule implements an international agreement between the United States and another sovereign state. In fact, that is the only circumstance to which the D.C. Circuit has applied it. In *International Brotherhood of Teamsters v. Pena*, 17 F.3d 1478 (D.C. Cir. 1994), the Circuit held that the foreign affairs function exception applied to a Federal Highway Administration rule implementing a Memorandum of Understanding ("MOU") between the United States and Mexico about the countries' reciprocal recognition of each other's commercial drivers' licenses. The court noted that "the rule does no more than carry out" the United States' "obligations to a foreign nation." *Id.* at 1486. The rule in that case merely "add[ed] a sentence to [a] footnote" in a regulation specifying that the Administrator had determined that Mexican commercial drivers' licenses met the United States' standards. *Id.* at 1481; *see also* Commercial Driver's License Reciprocity With

Mexico, 57 Fed. Reg. 31,454 (July 16, 1992) (discussing the negotiations between the United States and Mexico and including the text of the MOU itself). The exception also covers rules that regulate foreign diplomats in the United States. For example, in *City of New York v. Permanent Mission of India to United Nations*, the Second Circuit held that the exception covered an action by the State Department "exempt[ing] from real property taxes" any "property owned by foreign governments and used to house the staff of permanent missions to the United Nations or the Organization of American States or of consular posts." 618 F.3d at 175. As the court observed, "the action taken by the State Department to regulate the treatment of foreign missions implicates matters of diplomacy *directly*." *Id.* at 202 (emphasis added).

That Congress would categorically exclude rules like these from notice-and-comment procedures makes sense. The procedures enhance the rulemaking process by exposing proposed regulations to feedback from a broad set of interested parties. *See Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). But comments are unlikely to impact a rule to which the United States has already effectively committed itself through international agreement. *See Pena*, 17 F.3d at 1486 ("After all . . . the agreement called for the United States to recognize Mexican [commercial divers' licenses] even if comments revealed widespread objections."). Similarly, in the diplomatic context, agency action may be grounded in international reciprocity. *See City of New York*, 618 F.3d at 178 (noting that the State Department explained that its action "conforms to the general practice abroad of exempting government-owned property used for bilateral or multilateral diplomatic and consular mission housing").

But the Passport Rule is different. It creates a new requirement for all individuals seeking to immigrate to the United States in response to Defendants' concerns about fraud in that process. *See* 84 Fed. Reg. at 25,990 ("The Department has historically encountered significant numbers of

fraudulent entries for the DV Program each year, including entries submitted by criminal enter-prises on behalf of individuals without their knowledge.").  The Court has no reason to question those important concerns, but they are beside the point for the purposes of resolving Plaintiffs' challenge to the Passport Rule.  In the Court's view, the rule does not "clearly and directly" involve activities or actions characteristic of the conduct of international relations.  It does not, for exam-ple, itself involve the mechanisms through which the United States conducts relations with foreign states.  Nor was it the product of any agreement between the United States and another country.

Defendants do not really argue otherwise.  In fact, they never claim that the Passport Rule itself involves activities or actions characteristic of the conduct of international relations.  Instead, they stress that the program the rule "pertains to"—the Diversity Visa Program—"serves as a clear tool of diplomacy and outreach to countries around the world."  ECF no. 42 at 17 (quoting 84 Fed. Reg. at 25,990).  But that does not make the foreign affairs function exception applicable.

For one, the exception's application turns on the relationship of the *rule* to activities or actions characteristic of international relations, not the relationship of the *program* affected by the rule.  The Circuit made that clear when it said that notice-and-comment requirements do not apply only "to the extent that any of the enumerated categories is clearly and directly involved *in the regulatory effort at issue*."  *Humana*, 590 F.2d at 1082 (internal quotation marks omitted) (empha-sis added); *see also Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1289 (Ct. Int'l Trade 2019), *modified*, 476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) (assessing whether "*this rulemaking* involve[s] diplomatic functions, military functions, or other sensitive areas of foreign policy" (emphasis added)); *Rajah*, 544 F.3d at 437 (considering the effects of only "the public rulemaking provisions" at issue).

In any event, the Diversity Visa Program does not "clearly and directly" involve activities or actions characteristic of the conduct of international relations.  Defendants point out that this "important public diplomacy tool . . . helps create allies and goodwill overseas, while simultaneously promoting U.S. foreign policy interests."  ECF No. 42 at 24 (quoting 84 Fed. Reg. at 25,990).  But as Plaintiffs put it, "warm feelings from the inhabitants of foreign nations merely lay the groundwork for successful diplomacy; they are not in and of themselves the stuff of international relations."[8]  ECF No. 43 at 9.  The Court agrees.

Admittedly, it may seem like splitting hairs that the exception and Circuit precedent construing it distinguish between rules that "clearly and directly" involve activities characteristic of the conduct of international relations and those that may have indirect effects on the United States' diplomacy.  But of course, the Court is bound to apply both the statutory text and Circuit precedent as they are.  And it is worth noting that Congress's use of the word "function"—instead of, say, "effects" or "implications"—prevents the foreign affairs function exception from swallowing the rule.  There are many administrative actions that an agency might plausibly argue cause downstream effects in other countries or on international negotiations in which the United States is perpetually engaged.  In fact, some courts have warned that in the immigration context, the "dangers of an expansive reading of the foreign affairs exception . . . are manifest."  *City of New York*,

---

[8] Defendants cite *Raoof v. Sullivan,* 315 F. Supp. 3d 34, 43–44 (D.D.C. 2018), in support of their argument that the foreign affairs function exception applies here.  But the paragraph Defendants cite in that case is mostly about whether the State Department had the authority to promulgate the regulations at issue.  *Id*.  The court did ultimately conclude that the nonimmigrant exchange visitor program to which the regulations applied "relates to the foreign affairs and diplomatic duties conferred upon the Secretary of State and the State Department" and that the State Department correctly invoked the foreign affairs function exception.  *Id*. at 44.  But the plaintiffs in that case did not specifically challenge or even brief whether the exception applied.  *See* Pls.' Mem. P. & A. Opp'n Defs.' Mot. Dismiss, *Raoof v. Sullivan*, 315 F. Supp. 3d 34 (D.D.C. 2018) (No. 1:17-cv-01156-TNM), ECF No. 14.  To the extent that *Raoof* conflicts with the outcome here, the Court respectfully disagrees with it.

618 F.3d at 202; *see also Yassini*, 618 F.2d at 1360 n.4 ("The foreign affairs exception would become distended if applied to INS actions generally, even though immigration matters typically implicate foreign affairs."). And this is true in other areas of the law as well. One agency might reach for a too-sweeping interpretation of the foreign affairs function exception to argue that a rule involving climate change that affects other countries is subject to the exception. Another might contend that a rule about domestic production of some good or commodity that impacts ongoing trade negotiations is covered. Thus, courts of appeals have generally rejected the idea that the exception applies just because a rule "implicate[s] foreign affairs," *City of New York*, 618 F.3d at 202; *see also Zhang*, 55 F.3d at 744; *Yassini*, 618 F.2d at 1360 n.4, or "touche[s] on national sovereignty," *Jean*, 711 F.2d at 1478. None of this is to say that agencies are barred from taking these hypothetical actions; it simply means that they are not excused from engaging in notice-and-comment rulemaking if they do.

In the end, the Court has no reason to doubt that the Passport Rule is a small part of a broader program that may well help burnish the United States' reputation in countries all around the world. But any speculative, indirect effect that program may have on the United States' diplomacy does not clear the high bar necessary to dispense with notice-and-comment rulemaking under the foreign affairs function exception.

### 2. Post-Promulgation Notice and Comment

Because the APA's notice-and-comment requirements apply to the Passport Rule, Defendants should have provided the public with "notice of a proposed rule making" and an opportunity to comment at least "30 days before" the proposed rule's effective date. 5 U.S.C. § 553. Instead, Defendants issued the Passport Rule with no notice, effective immediately. Still, Defendants argue that—regardless of the foreign affairs function exception—their promulgation process was "legally sufficient." ECF No. 42 at 24. In fact, they go as far as to say that Plaintiffs "are incorrect"

to "assert that the [Passport Rule] is procedurally deficient under the notice and comment rule-making provisions of the [APA]" because the State Department published the rule in the Federal Register and allowed the public to submit comments after it went into effect.  ECF No. 28-1 at 7.  This argument is as bold as it is wrong.

The APA's notice-and-comment procedures are not a mere formality.  They "are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."  *Int'l Union*, 407 F.3d at 1259.  They also "attempt[] to provide a 'surrogate political process' that takes some of the sting out of the inherently undemocratic and unaccountable rule-making process."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, --- U.S. ----, 140 S.Ct. 1891, 1929 n.13 (2020) (Thomas, J., dissenting) (citation omitted)).

Critical to these goals is the timing of the procedures.  As the D.C. Circuit has explained, "[p]ermitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way."  *New Jersey*, 626 F.2d at 1049 (quoting *U.S. Steel Corp. v. EPA*, 595 F.2 207, 214–15 (5th Cir. 1979)).  First off, it is unlikely "that persons would bother to submit their views or that the [agency] would seriously consider their suggestions after the regulations are a fait accompli."  *Id.*  More importantly, if courts allowed the "provision" of "post hoc" notice and comment to "cure[]" an agency's "failure to follow [the APA's notice-and-comment] procedures," those requirements would be "virtually unenforceable.  An agency that wished to dispense with pre-promulgation notice and comment could simply do so, invite post-promulgation comment, and republish the regulation before a reviewing court could act."  *Id.*

Other courts have said the same.  *See Sharon Steel Corp. v. EPA*, 597 F.2d 377, 381 (3d Cir. 1979) ("Provision of prior notice and comment allows effective participation in the rulemaking process while the decisionmaker is still receptive to information and argument.  After the final rule is issued, the petitioner must come hat-in-hand and run the risk that the decisionmaker is likely to resist change."); *Maryland v. EPA*, 530 F.2d 215, 222 (4th Cir. 1975), *vacated on other grounds sub nom. EPA v. Brown*, 431 U.S. 99 (1977) ("The reception of comments after all the crucial decisions have been made is not the same as permitting active and well prepared criticism to become a part of the decision-making process.").

Contrary to Defendants' suggestion, the Court never suggested differently when denying Plaintiffs' motion for a preliminary injunction.  The Court did hold that the Passport Rule's publication in the Federal Register provided Plaintiffs "notice as a matter of law."  *E.B.*, 422 F. Supp. 3d at 90.  But it did so in the context of addressing Plaintiffs' claim that they suffered irreparable harm because they did not learn about the rule in time to get passports before that year's lottery application window closed.  *Id.*  That has nothing to do with whether Defendants complied with their obligations under the APA.  And the other cases Defendants cite on this score do not concern APA notice-and-comment rulemaking at all.[9]

---

[9] *See Camp v. U.S. Bureau of Land Mgmt.*, 183 F.3d 1141, 1145 (9th Cir. 1999) (considering whether publication of notice in the Federal Register could start the statute of limitations running on the plaintiff's claims); *Friends of Sierra R.R., Inc. v. Interstate Com. Comm'n*, 881 F.2d 663, 667–68 (9th Cir. 1989) (rejecting argument that a party could not participate in an agency proceeding because the party had adequate notice of the hearing as a matter of law because of its publication in the Federal Register); *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 953 (D.C. Cir. 2013) (holding that the date of filing a document to be published in the Federal Register is the relevant date for determining presence of a quorum); *Lyng v. Payne*, 476 U.S. 926, 942–43 (1986) (finding that notice via publication in the Federal Register satisfied any due process concerns); *Hopp v. United States*, 661 F. Supp. 800, 801–02 (S.D. Iowa 1987) (concluding that a regulation could be applied retroactively to deprive the plaintiffs of a tax credit for a heat pump because the proposed regulation had been published in the Federal Register before the plaintiffs' bought the heat pump).

At bottom, Defendant's post-promulgation process is irrelevant to whether they complied with the APA's notice-and-comment rulemaking procedures, and no case they cite suggests otherwise. Defendants failed to provide notice or an opportunity to comment *before* the Passport Rule went into effect. And for that reason, the rule was enacted unlawfully. *See* 5 U.S.C. § 553.

### B.    Vacatur Is Appropriate

The APA commands that courts "hold unlawful and set aside agency action[s]" taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). And the D.C. Circuit has held that "[f]ailure to provide the required notice and to invite public comment . . . is a fundamental flaw that 'normally' requires vacatur of the rule." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002)); *see also Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012) ("Because EPA lacked good cause to dispense with required notice and comment procedures, we conclude the IFR must be vacated without reaching Petitioners' alternative arguments."). Having found that the Passport Rule was enacted unlawfully, the Court sees no reason why it should not be vacated.

Defendants themselves never argue for full-on remand without vacatur. That is no surprise—that remedy is only permitted "in limited circumstances." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020). To determine whether it is appropriate, the Circuit has directed courts to look at two factors: "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied–Signal, Inc. v. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

As to the first factor, it is hard to say what the agency would have done had it received comments *before* promulgating the Passport Rule, but deficient notice "almost always requires

vacatur." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014); *see also Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 268 (D.D.C. 2015) ("The Court is unable to evaluate whether the Secretary's decision was reasonable because her omission prevented the public from offering meaningful comments."). And as explained above, offering the public notice and the opportunity to comment after the fact is no cure. *New Jersey*, 626 F.2d at 1049–50. As for the second factor, Defendants have presented no evidence suggesting that "[t]he egg has been scrambled" so that "there is no apparent way to restore the status quo ante." *Sugar Cane Growers*, 289 F.3d at 97 (D.C. Cir. 2002).

Defendants do argue that the Court should temporarily stay any vacatur order, but the reasons it offers for doing so are no longer relevant.[10]  When Defendants briefed their opposition to Plaintiffs' motion for summary judgment, the visa lottery application window was open. *See* ECF No. 42. According to Defendants, vacating the Passport Rule then would have created many problems, "including the prospect of immediately accepting diversity applications from foreign nationals without any proof of their identity," thus "perpetuat[ing] the fraud the rule was trying to combat" and "caus[ing] confusion for those who have already submitted their applications with a valid foreign passport." ECF No. 42 at 27. Fair enough. But at this point, those reasons are no longer operative. The application window is not open now, and it appears it will not open until sometime in October. *See* ECF No. 28-1 at 14 (explaining that the Department opens a new application window at the start of the fiscal year); *see also* ECF No. 38-1 at 14–15 (detailing the dates of past application windows). Thus, Defendants will have about eight months to address the Passport

---

[10] Defendants also request that the Court order further briefing on this issue, but they offer no reason why more briefing is necessary. *See* ECF No. at 26–28.

Rule's vacatur in whatever way they choose, including by promulgating a new rule and complying with notice-and-comment rulemaking procedures.

## IV.    Conclusion

For all these reasons, the Court will deny Defendants' motion to dismiss, grant Plaintiffs' motion for summary judgment, and vacate the Passport Rule.  A separate order will issue.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 4, 2022